

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHERI SWANN, | ) | |
| | ) | |
| Plaintiff, | ) | 05 C 5919 |
| | ) | |
| v. | ) | Hon. Charles R. Norgle |
| | ) | |
| WILLIAM RAINEY HARPER COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

CHARLES R. NORGLE. District Judge

Before the court is Defendant's Motion for Summary Judgment as to Counts I, II, III, IV,

VII, VIII, and IX. For the following reasons, the Motion is granted.

## I. BACKGROUND

### A. Facts

Plaintiff Cheri Swann ("Swann") is an African-American female employed by Defendant

William Rainey Harper College (the "College"). The College is a community college created

pursuant to the Illinois Public Community College Act. It is located in Palatine, Illinois. The

College employed Swann as a security guard from November 27, 2000 until 2003. At some

point in 2003, the College promoted Swann to the position of Community Services Officer,

Patrol. The parties do not specify precisely when this occurred. Swann worked at the College as

a Community Services Officer until March 22, 2005, when the College terminated Swann's

employment.

1

While Swann was employed by the College, she reported to Michael Alsup ("Alsup"), the Chief of Police of the Public Safety Department, Don Evangelista ("Evangelista"), the Assistant Supervisor of the Public Safety Department from January 2002 until August 2004, and Paul LeBreck ("LeBreck"), the Assistant Supervisor of the Public Safety Department beginning February 7, 2005. Swann had previously worked with Alsup at the College of DuPage, in Glen Ellyn, Illinois.

Swann's job description included the following duties: patrolling the campus; maintaining the security of the campus grounds and buildings; maintaining the safety of the students, employees, and visitors; opening and locking buildings and rooms; and providing information and assistance as needed. The parties agree that Swann worked well with minority students during her employment at the College. Alsup therefore routinely assigned Swann to patrol areas of the College where minority groups congregated.

On Saturday February 3, 2001, three months after she was hired, Swann was arrested for retail theft in Villa Park, Illinois. That night, Swann called Alsup, advised him that she had been arrested, and expressed her fears that this incident might cause her to lose her job. Alsup attempted to calm Swann, instructed her to get a good night's sleep, and indicated that they would meet to discuss the situation on Monday morning. During the Monday morning meeting, Alsup explained to Swann that this incident was very serious, and that if she further jeopardized her reputation, or the reputation of the College's Public Safety Department, she could be subject to suspension or termination. Alsup noted Swann's arrest in her subsequent Performance Evaluation, and notified the College's Director of Personnel, Larry Bielawa, of the arrest. Alsup

2

advised Swann to obtain legal representation, and later, provided Swann with the name of an attorney to contact. Swann was not convicted.

On approximately May 2, 2002, one of Swann's co-workers, John Farris ("Farris") commented to Swann that "[t]hose monkeys over there are getting out of control and they need to just block off that whole area so that none of them can hang out there anymore." Swann asserts that Farris was referring to African-American students who tended to congregate near the College bookstore. Swann later spoke to Farris about this comment, and Farris replied that he was "not racist" and "did not mean anything by that." In her deposition testimony, Swann indicates that Farris' reply was delivered in an angry and defensive tone of voice. Swann then complained to Alsup about this comment. The parties agree that Alsup spoke to Farris about this incident, and that after Alsup and Farris' meeting, Farris made no comments regarded as offensive by Swann.

Notwithstanding her arrest, the College promoted Swann in 2003. However, at some point in June of that year, Swann and Alsup's professional relationship soured. The parties agree that Swann and Alsup developed difficulties in communicating effectively with each other. In addition, Swann's deposition testimony indicates that Alsup had occasionally begun to make inappropriate racial and sexual jokes and comments in Swann's presence. Swann spoke with Evangelista, and informed him that she had become frustrated working with Alsup, and that the situation between them was "tense." Swann and Evangelista's deposition testimony also indicates that she complained to Evangelista that she was being assigned to monitor minority students because she was African-American.

In response to Swann's concerns, Evangelista recommended that he and Swann visit Cheryl Kisunzu ("Kisunzu"), the College's Associate Vice President for Diversity and

3

Organizational Development. In his deposition, Evangelista testified that Swann's perception was that many of Alsup's remarks and jokes had taken on a "racial overtone." However, when asked in deposition if she complained to Kisunzu about racial harassment on the part of Alsup, Swann indicated that she had no memory of doing so. Swann then met with the College's Vice President of Administrative Services Judy Thorson ("Thorson"). Swann complained to Thorson about the difficulties that had developed between her and Alsup, and indicated to Thorson that Alsup made racial and/or sexual jokes "once or twice a month." After meeting with Thorson, Swann never complained about Alsup to anyone else at the College. In her deposition, however, Swann indicated that Alsup continued to make racial and sexual jokes from time to time.

It is apparent from the record that by the spring of 2004, a certain amount of tension had developed between Swann and others within the Public Safety Department. Some of this tension, according to Swann, had racial undertones. Swann, however, testified that she never felt sexually harassed while working at the College.

Swann's deposition testimony indicates that she felt racially harassed occasionally while working at the College, especially during the wallet incident. The wallet incident, as the court will explain, ultimately led to Swann's termination from the College's Public Safety Department. At approximately 10:30 a.m. on March 8, 2005, police officer Phillip Robert ("Robert") entered the College's Public Safety Office with a lost-and-found wallet. Swann was working at the Office's dispatch desk at the time. Robert placed the wallet on the dispatch counter, informed Swann that the wallet had recently been turned in, and left the Office. Both parties agree that Swann, as the dispatcher on duty at that time, had custody and control of the wallet, and that she was therefore responsible for safeguarding it. The parties dispute whether it was Swann's duty to

4

inventory the contents of the wallet, although they agree that lost-and-found items were always inventoried by someone in the Public Safety Office.

Approximately ten to twenty minutes after Robert left the Office, Swann inventoried the contents of the wallet. During her inventory of the wallet, Swann found six dollars in cash, along with other items such as bank and credit cards. Swann then orally notified the two other individuals in the Office, LeBreck and police officer Mark Goff ("Goff"), that she had found cash in the wallet. After Swann finished her inventory of the wallet, she placed it in a lost-and-found locker. The parties dispute whether Swann was ever alone with the wallet. When the owner of the wallet retrieved it from the Office, he claimed that there was at least twenty dollars in cash missing. In deposition testimony, Robert asserted that when the wallet was in his possession, it contained thirty-seven dollars in cash.

The next day, LeBreck met with Swann to discuss the situation regarding the missing cash. Swann asserted that when she inventoried the wallet, it contained only six dollars, and that she did not take any money out of the wallet. Swann was unable to explain the discrepancy between the six dollars she found in her inventory, and the thirty-seven dollars Robert asserted that the wallet contained when he placed it on the dispatch counter. After an approximately ten minute conversation with LeBreck, which Swann characterizes as a "heated," "aggressive," and an "interrogation," Swann indicated that she would not discuss the incident any further without an attorney present, and left the room. The next day, Swann met with Kisunzu and complained that she was being "set up" and "discriminated against" with respect to the investigation into the missing cash.

5

One day later, Swann and her union representative met with LeBreck. During this meeting, LeBreck informed Swann that she was under investigation for the alleged theft of the missing cash. Swann indicated that she wanted to secure legal representation, and the meeting was adjourned. LeBreck also met with Robert regarding the missing cash. Robert agreed to meet without an attorney present, and took and passed a polygraph test.

Later, Swann, her union representative, LeBreck, and Alsup met. Alsup questioned Swann regarding the wallet, but Swann still could not explain what had happened to the missing cash. Alsup offered Swann the opportunity to take a polygraph test, but she declined. At another meeting between LeBreck, Swann, her union representative, and her union attorney, Swann again was unable to explain the missing cash, and again declined the invitation to take a polygraph test. In her deposition testimony, Swann asserts that during this meeting, LeBreck accused her of stealing the cash. At the conclusion of this meeting, Alsup informed Swann that she was being placed on unpaid suspension pending the outcome of the investigation.

Alsup and Bielawa then met in order to discuss the investigation into the missing cash. Alsup did not believe Swann's assertion that she had no knowledge of what happened to the money, and he eventually recommended that Swann be terminated. At a later meeting, Bielawa, Alsup, and Thorson discussed whether Swann had violated any College policies, procedures, or rules. They also discussed Robert's willingness to take the polygraph test, and the fact that he had passed that test. They determined that Robert was truthful when he indicated that there was thirty-seven dollars in cash in the wallet when he handed it to Swann. At the conclusion of the meeting, Bielawa and Thorson concurred with Alsup's recommendation to terminate Swann.

6

She was terminated basically for her performance reasons; that in her capacity as a dispatcher she should have reviewed the contents of the wallet right away and confirmed what was in there. And as a result of her inaction to do that and her unwillingness to participate in the investigation or to provide rationale for how the money disappeared, we felt she violated the contract. And the fact that it brought discredit upon the department when the person came in looking for the money and we've got part of the department saying it was there and part of the department saying it wasn't there.

Bielawa Dep., at 85-86.

On March 22, 2005, Swann met with Alsup again. During this meeting, Alsup asked Swann if she had any explanation for the missing cash. Swann had none. Alsup then offered Swann another chance to take a polygraph test, but Swann refused. Alsup then informed Swann that he would recommend to the College that she be discharged. Alsup confirmed this recommendation in a letter to Swann dated March 22, 2005. In that letter, Alsup wrote,

This will confirm our conversation of today, March 22, 2005, concerning your violation of College and Public Safety Department rules and regulations. Specifically, we discussed your inability to explain the loss of United States currency which was in your control and custody and your extreme bad judgment in the circumstances concerning this matter which has brought discredit to the Department and the College. I have concluded my review and investigation of the available information concerning this matter. Based on my review, I am recommending that your disciplinary suspension, without pay, be changed to a termination of employment effective today, March 22, 2005.

Def.'s Rule 56.1 Statement, Ex. 5.

## B. Procedural History

Swann filed an Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination against the College on May 15, 2005. The EEOC issued Swann a Notice of Right to Sue letter on August 22, 2005. Swann timely filed her initial Complaint against the College

on October 14, 2005. On December 4, 2006, Swann filed her First Amended Complaint. Her First Amended Complaint is the operative complaint in this case.

Swann's First Amended Complaint contains the following claims for relief: Counts I and II allege race and gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); Count III alleges a hostile work environment based on race and sex in violation of Title VII; Count IV alleges retaliation in violation of Title VII; Count V alleges a state law claim of intentional infliction of emotional distress; Count VI alleges a state law claim of negligent training and supervision; Count VII alleges race discrimination in violation of 42 U.S.C. § 1981; Count VIII alleges race and gender discrimination in violation of 42 U.S.C. § 1983; and Count IX alleges a violation of the Employee Polygraph Protection Act ("EPPA"), 29 U.S.C. § 2001 et seq.[1]

On November 7, 2007 the court ordered the College to refile its Motion for Summary Judgment without reference to Swann's state law claims. The court reinforced this Order in a November 19, 2007 Minute Order. The College filed its Motion for Summary Judgment, addressing only Swann's federal claims, on November 19, 2007. That Motion is fully briefed and before the court.

---

[1] The court notes that Swann asserts claims of race and gender discrimination, a hostile work environment, and retaliation under both Title VII and 42 U.S.C. §§ 1981 and 1983. In the Seventh Circuit, these types of claims are analyzed in the same manner whether they are brought under Title VII or §§ 1981 and 1983. See Herron v. Daimler Chrysler Corp., 388 F.3d 293, 299 (7th Cir. 2004); Williams v. Waste Mgmt. of Ill., Inc., 361 F.3d 1021, 1028 (7th Cir. 2004). The court will therefore not address these claims separately.

8

## II. DISCUSSION

### A. Standard of Decision

#### 1. Summary Judgment

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Cornfield v. Consolidated High Sch. Dist. No. 230, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Murphy v. ITT Technical Services, Inc., 176 F.3d 934, 936 (7th Cir. 1999).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. FED. R. CIV. P. 56(c); see also Perdomo v. Browner, 67 F.3d 140, 144 (7th Cir. 1995). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 280 (1968); Wolf v. Buss (America) Inc., 77 F.3d 914, 922 (7th Cir. 1996). When adjudicating a motion for summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from facts; these are jobs for a factfinder." Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

When the defendant moves for summary judgment, the court must view the record and all inferences in a light most favorable to the plaintiff. Ameritech Benefit Plan Comm. v. Communication Workers of Am., 220 F.3d 814, 821 (7th Cir. 2000). However, the inferences construed in the plaintiff's favor must be drawn from specific facts identified in the record that support the plaintiff's position. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 922-23 (7th Cir. 1994). Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hospital and Medical Center, 328 F.3d, 890, 892-93 (7th Cir. 2003)(citing Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888-89 (1990)).

### 2. Discrimination and Retaliation

In order to survive this Motion for Summary Judgment as to her discrimination and retaliation claims, Swann may proceed by direct or indirect evidence. Direct evidence of discriminatory or retaliatory intent is evidence that shows the employer's intent without the need to rely on "inference or presumption." Bahl v. Royal Indem. Co., 115 F.3d 1283, 1290 n.6 (7th Cir. 1997). Direct evidence is evidence that "speak[s] directly to the issue of discriminatory intent, [and] also relate[s] to the specific employment decision in question." Oates v. Discovery Zone, 116 F.3d 1161, 1170 (7th Cir. 1997). It is likely the case that the only real direct evidence of discriminatory or retaliatory intent is an admission by the employer. Logan v. Kautex Textron N. Am., 259 F.3d 635, 638 (7th Cir. 2001); Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir. 1994).

To proceed by means of by indirect evidence, a plaintiff must use the familiar McDonnell Douglass burden-shifting method. See McDonnell Douglass Corp. v. Green, 411 U.S. 792, 802-04 (1973). Under this method, a plaintiff must first establish a prima facie case. A prima facie

10

case of discrimination must show 1) that the plaintiff was "within a protected class," 2) that the plaintiff "was performing to the employer's legitimate expectations," 3) that she "suffered an adverse employment action," and 4) that the employer "treated similarly situated employees of a different race more favorably." Kautex, 259 F.3d at 639; see also Little, 369 F.3d at 1011. A prima facie case of retaliation must show 1) that the plaintiff "engaged in statutorily protected expression," 2) that she "suffered an adverse employment action," and 3) that there is a "causal link between the two." Kautex, 259 F.3d at 640; see also Bell v. EPA, 232 F.3d 546, 554 (7th Cir. 2000). If the plaintiff presents a prima facie case, there is a presumption of discrimination or retaliation, and the burden shifts to the employer to show a "legitimate, nondiscriminatory reason" for the adverse employment action. Stockett v. Muncie Ind. Transit Sys., 221 F.3d 997, 1001 (7th Cir. 2000); see also Little, 369 F.3d at 1011. If the employer can show a legitimate reason for the adverse employment action, the burden shifts back to the plaintiff to show that the proffered reason was pretextual. Stockett, 221 F.3d at 1001; see also Gordon v. United Airlines, 246 F.3d 878, 886 (7th Cir. 2001).

### 3. *Hostile Work Environment*

Under Title VII, employers may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). Courts have interpreted this statute to prohibit employers from forcing employees to "work in a discriminatory hostile or abusive environment." Shanoff v. Ill. Dept. of Human Serv., 258 F.3d 696, 701 (7th Cir. 2001) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Workplace discrimination in the form of "'intimidation, ridicule, and insult' that is 'sufficiently severe or

11

pervasive to alter the conditions of the victim's employment and create an abusive working environment'" violates Title VII. Harris, 510 U.S. at 21 (citation omitted) (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)). An employer is liable if either the plaintiff's supervisor created the hostile work environment, Mason v. S. Ill. Univ., 233 F.3d 1036, 1043 (7th Cir. 2000) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998)); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998), or a co-worker created the hostile work environment, and the employer was "negligent either in discovering or remedying the harassment." Mason, 233 F.3d at 1043; Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1032 (7th Cir. 1998).

To recover for a hostile work environment, a plaintiff must show that she was "subject to unwelcome harassment," that the harassment was based on her race (or "color, religion, sex, or national origin," 42 U.S.C. §2000e-2(a)(1)), that the harassment was severe or pervasive enough to "alter the conditions of the employee's environment and create a hostile or abusive working environment," and that "there is a basis for employer liability." Mason, 233 F.3d at 1043. A plaintiff must demonstrate that the workplace was both "subjectively and objectively offensive." Cerros v. Steel Tech., Inc., 288 F.3d 1040, 1045 (7th Cir. 2002) (quoting Faragher, 524 U.S. at 787); see also Shanoff, 258 F.3d at 704. Not every instance of rude or insulting behavior, however, creates a statutory violation. See Cerros, 288 F.3d at 1045-46 (7th Cir. 2001). Conduct that is "merely offensive" does not rise to the level of creating a hostile work environment. Id. at 1046 (citing Harris, 510 U.S. at 22). In determining whether a hostile work environment exists, courts will consider the frequency of the offensive conduct, its severity, whether the conduct was threatening or merely offensive, and whether the conduct "unreasonably interferes with an

12

employee's work performance." Quantock v. Shared Mktg. Serv., Inc., 312 F.3d 899, 904 (7th Cir. 2002); see also Adusumilli v. City of Chicago, 164 F.3d 353, 361 (7th Cir. 1998).[2]

### 4. The Employee Polygraph Protection Act

Under EPPA, 29 U.S.C. § 2001 et seq., it is unlawful for employers to

require, request, suggest, or cause any employee . . . to take or submit to a lie detector test . . . [or] to discharge, discipline, discriminate against in any manner, or deny employment or promotion to, or threaten to take any such action against – any employee . . . who refuses, declines, or fails to take or submit to any lie detector test, or any employee . . . on the basis of the results of any lie detector test.

29 U.S.C. § 2002. However, this statute does not apply to "the United States Government, any State or local government, or any political subdivision of a State or local government." 29 U.S.C. § 2006. Under Illinois law, a Community College District is considered a "'unit of local government' and therefore a 'political subdivision' . . . ." Bd. of Trs. v. Dep't of Prof'l Regulation, 842 N.E.2d 1255, 1266 (Ill. App. Ct. 2006); Luciano v. Waubonsee Community College, 614 N.E.2d 904, 908 (Ill. App. Ct. 1993).

## B. The College's Motion for Summary Judgment

### 1. Swann Fails to Establish a Prima Facie Case of Discrimination or Retaliation

Swann presents the court with no direct evidence of discriminatory or retaliatory intent by the College. She must therefore proceed by means of indirect evidence. In order to establish a prima facie case that she was terminated for discriminatory reasons, Swann must present evidence that: she is a member of a protected class; she "was performing to the [College's] legitimate expectations;" she "suffered an adverse employment action;" and the College "treated

---

[2] This standard applies to both race and gender discrimination in the workplace. Hardin v. S.C. Johnson & Sons, Inc., 167 F.3d 340, 345 (7th Cir.1999).

similarly situated employees of a different race more favorably." Kautex, 259 F.3d at 639; see also Little, 369 F.3d at 1011. There is no question that Swann is an African-American female and therefore a member of a protected class. There is also no question that she was suspended, and then terminated, and therefore suffered an adverse employment action. However, the undisputed facts in this case show that Swann was not performing her job to the College's legitimate expectations, and that the College did not treat similarly situated employees of another race more favorably.

The undisputed facts regarding the lost wallet incident are as follows. Swann was working dispatch at the College's Public Safety Office at approximately 10:30 a.m. on March 8, 2005. Officer Robert brought a lost-and-found wallet to the Public Safety Office at that time, and placed the wallet on the dispatch desk. The wallet was then in Swann's custody and control for approximately ten to twenty minutes. Robert asserts that the wallet at contained thirty-seven dollars at that time, and the results of a polygraph examination given to Robert support that assertion. When Swann inventoried the wallet, ten to twenty minutes after she received it into her custody and control, she announced to the two other individuals then in the Office that the wallet contained only six dollars. The individual who later claimed the wallet complained about the loss of approximately twenty dollars. Swann never provided Alsup or anyone else in the Public Safety Department a satisfactory explanation for what happened to the missing cash.

The College asserts that Swann's job performance during this incident was unacceptable, and the court agrees. The court makes no specific finding as to whether Swann took the missing cash. However, the undisputed facts demonstrate that the wallet was in Swann's custody and control for as long as twenty minutes, and all the available evidence indicates that the missing

14

cash disappeared at some point during that time. The court therefore finds that Swann was not performing to the College's legitimate expectations.

The court also finds that other similarly situated individuals of a different race were not treated more favorably. Swann correctly asserts that officer Robert, a Caucasian male, the only other individual alleged to have handled the wallet during the time period in question, was not terminated. However, there are significant differences between officer Robert and Swann. Officer Robert accepted the College's invitation to take a polygraph test regarding the wallet incident, and he passed. Swann refused the College's offers to take a polygraph. Officer Robert agreed to meet with College officials regarding this incident, and fully explained his actions. Swann initially refused to meet without an attorney present, and never explained her actions during this incident to the satisfaction of College officials. Because Swann was not meeting the College's legitimate job expectations, and because similarly situated individuals of a different race or gender were not treated differently than Swann, the court determines that Swann has therefore not established a prima facie case of discrimination. See Kautex, 259 F.3d at 639; see also Little, 369 F.3d at 1011.

In order to establish a prima facie case of retaliation, Swann must show that: she "engaged in statutorily protected expression;" she "suffered an adverse employment action;" and there is a "causal link between the two." Kautex, 259 F.3d at 640; see also Bell v. EPA, 232 F.3d 546, 554 (7th Cir. 2000). The parties do not dispute whether Swann's complaints to Evangelista and Thorson about Alsup, and her complaints to Kisunzu about the wallet incident investigation, are protected expressions. Neither do the parties dispute whether Swann suffered an adverse employment action. However, the College asserts that Swann has provided the court with no

15

evidence of a causal connection between her expressions and her suspension and termination. The court agrees. The undisputed facts in this case clearly demonstrate that Swann was suspended and terminated for her unacceptable job performance during the wallet incident, and for her failure to cooperate in the resulting investigation. Neither of these reasons have anything to do with Swann's complaints to Evangelista, Thorson, or Kisunzu.

### 2. Swann Fails to Establish that the College's Stated Reason for Suspending and Firing Her was Pretextual

If the court were to assume, for the sake of argument, that Swann had demonstrated a prima facie case of either discrimination or retaliation, the burden would then shift to the College to provide a legitimate, non-discriminatory or non-retaliatory reason for Swann's termination. The court finds that the College has met its burden. The burden would then shift back to Swann to demonstrate that the College's stated reasons for her termination were mere pretext for discrimination or retaliation.

The College's stated reason for terminating Swann, as the court has explained, was its belief that she had not met her job expectations during the wallet incident, and its belief that she had been less than forthcoming during the College's investigation of this incident. "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." Stewart v. Henderson, 207 F.3d 374, 378 (7th Cir. 2000). There is simply no indication in the record that the College has been dishonest in articulating its reasons for terminating Swann. Whether the College made a good or bad decision in terminating her is not an issue properly before the court. "We do not sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of the decision. . . Our only

16

concern is whether the legitimate reason provided by the employer is the true one." Id.; see also Johnson v. Hondo, Inc., 125 F.3d 408, 415 (7th Cir. 1997) ("Title VII does not prohibit unfairness or wrongheaded decisions in the workplace."). Swann has presented the court with no facts that suggest pretext, and the court therefore finds that Swann has failed to meet her burden.

Since Swann cannot establish a prima facie case of discrimination or retaliation, and cannot present evidence that would establish a genuine question of material fact as to whether the College's stated reasons for terminating her were pretextual, her claims of discrimination and retaliation fail.

### 3. Swann Fails to Establish a Genuine Issue of Material Fact as to whether She Was Subject to a Hostile Work Environment Based upon Race or Gender

In order to establish that she was subject to a hostile work environment based upon her race or gender, Swann must present evidence that: she was "subject to unwelcome harassment;" the harassment was based on her race or gender; the harassment was severe or pervasive enough to "alter the conditions of [her] environment and create a hostile or abusive working environment;" and "there is a basis for employer liability." Mason, 233 F.3d at 1043. The Seventh Circuit has set the bar high for plaintiffs alleging a hostile work environment. "Not every unpleasant workplace is a hostile environment. The occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers would be neither pervasive or offensive enough to be actionable. The workplace that is actionable is the one that is hellish." Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997) (internal quotation marks and citation omitted).

17

As to Swann's claim that she was sexually harassed, the record is clear that any such harassment, if it occurred at all, could not have been "severe or pervasive." In fact, during her deposition testimony, Swann asserted that she had not been sexually harassed.

"Question: So do you claim that [at] any time during your employment at Harper College you were sexually harassed?

Answer: Sexually harassed, no."

Swann Dep., at 225. In addition to this admission by Swann, the undisputed facts in this case show that any alleged sexual harassment Swann may have experienced at the College could not have been "severe or pervasive." In her answer to the College's Local Rule 56.1 Statement, Swann admits that Alsup made a sexual joke or comment only "once or twice per month approximately every other month." Swann could not recall the specific nature of any of these jokes or comments. Other than the occasional sexual jokes uttered by Alsup, there is no indication in the record that anyone at the College harassed Swann because of her gender. There is no evidence that, for example, anyone at the College touched her inappropriately, asked her out on dates, or invited her to have sex.

As to Swann's claim that she was harassed because of her race, the record again is clear that any alleged racial harassment Swann experienced at the College could not have been "severe or pervasive." Swann asserts that she was racially harassed during the wallet incident, and when she was subjected to comments or jokes of a racial nature. In her deposition testimony, Swann claims that Alsup made racial comments or jokes once or twice a month, but she could not recall the specific nature of these jokes or comments. Swann Dep., at 218-19. The parties agree that Swann's co-worker Farris used the term "monkeys" to refer to African-American students during

18

a conversation with Swann. The parties also agree that after Swann complained to Alsup about this incident, Farris made no more offensive comments to Swann.

Swann met with Thorson to discuss these sexual and racial comments and jokes, and after that meeting, Swann admits that she heard Alsup make a racial or sexual joke or comment on only two occasions. In addition, Swann asserts that an August, 2004 Public Safety Staff Performance Evaluation signed by Alsup is evidence that Alsup had retaliated against her for her complaints regarding the alleged sexual and racial harassment. The following are excerpts from that Performance Evaluation.

> Cheri demonstrates appropriate knowledge of policies and regulations used in her job. She effectively applies knowledge to her work situations . . . Cheri willingly attends developmental in-service training . . . In the Fall of 2003, Cheri responded favorably to the opportunity to assist the department and this institution with the transition of the students and community from outside the Bookstore in Building L to their new area in the Student and Administration Center. Even though it was a trying time, Cheri exhibited the ability to gather data and make sound judgments from it. She displayed tact, respect, and discretion in that stressful period . . . Cheri is extremely sensitive to the needs of the students – especially minority students . . . Cheri does not always respond well to performance improvement suggestions. In this evaluation period it became extremely difficult, if not impossible, to offer suggestions for work improvement. It became so bad that I had to ask Sergeant Evangelista to step in for me. This resulted in the abandonment of our chain-of-command and led to the delivery of Cheri to the Vice-President of Administrative Services for resolution of the perceived problem . . . Summary Comments: Cheri is a productive member of our team. As she matures, both personally and professionally, she is becoming an even more important contributor to our success. Her counsel is sought and that should serve as a testament to her increasing professionalism.

Def.'s Ex. 18. There is no indication in this Performance Report that Alsup was retaliating in any way against Swann. In her deposition testimony, Swann indicates that Alsup "started treating me differently. He would nitpick at certain things more than he would have in the past." Swann Dep., at 205. Again, there is no indication here, or in any other part of the record, that

19

Swann was retaliated against for voicing her concerns to College officials regarding the alleged harassment.

The court finds that the incidents Swann reports do not rise to the level of an actionable racially hostile workplace. For Swann to survive summary judgment on this claim, she must show, *inter alia*, that the conduct she complains of is "severe" or "pervasive." See Faragher, 524 U.S. at 787; Cerros, 288 F.3d at 1045; Mason, 233 F.3d at 1043. By way of example, the court points to two incidents of conduct clearly severe or pervasive enough to establish a legitimately racially hostile working environment. In Cerros, the Hispanic plaintiff was referred to as "'brown boy,' 'spic,' [and] 'wetback.'" Cerros, 288 F.3d at 1042. In addition, "racist graffiti was painted on the bathroom walls. It included racial remarks and symbols such as 'spic,' 'Go Back to Mexico,' 'Tony Cerros is a Spic,' 'KKK,' and 'White Power.'" Id. Finally, the "tires on Cerros' car were slashed." Id. In Ferguson, the African American plaintiff was forced to endure graffiti stating "death to all niggers," "Fuck Niggers," a Ku Klux Klan poster hung in a work trailer, and "the display of a hangman's noose." Ferguson, 334 F.3d at 658. The incidents Swann complains of are at worst sporadic incidents of insensitivity, and simply do not rise to the required level of severity or pervasiveness. Since Swann cannot show that an issue of material fact exists as to whether the conduct she complains of is severe or pervasive, her claim of a sexually and racially hostile work environment fails.

### 4. Swann's Refusal to Take a Polygraph Exam

In order for Swann to survive summary judgment on her EPPA claim, she must show that the College is not a "political subdivision of a State or local government." See 29 U.S.C. § 2006. This she cannot do. It is clear that the College is a Community College created pursuant to the

20

Illinois Community College Act, see Def.'s Ex. 6, and is thus a "'unit of local government' and therefore a 'political subdivision' . . . ." See Bd. of Trs., 842 N.E.2d at 1266; Luciano, 614 N.E.2d at 908. Swann's EPPA claim therefore fails.

## III. CONCLUSION

For the foregoing reasons, the College's Motion for Summary Judgment as to Counts I, II, III, IV, VII, VIII, and IX is granted.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATED: May 20, 2008